UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANKUR CHABLANI,<br><br>    Plaintiff,<br><br>    v.<br><br>CALIFORNIA INSTITUTE OF<br>INTEGRAL STUDIES, et al.,<br><br>    Defendants. | Case No. 25-cv-06587-AMO<br><br>**ORDER GRANTING MOTIONS TO DISMISS; DENYING MOTION TO STRIKE & AMENDED MOTION TO DISMISS AS MOOT**<br><br>Re: Dkt. Nos. 47, 48, 51, 52 |

Ankur Chablani brings this action against California Institute of Integral Studies and California College of the Arts following an investigation into alleged sexual misconduct that led to his expulsion from a doctoral program.  Before the Court are California Institute of Integral Studies' motion to dismiss and its combined motion to amend and amended motion to dismiss, Chablani's motion to strike the amended motion to dismiss, and California College of the Arts' motion to dismiss.  The motions are fully briefed and suitable for disposition without hearing pursuant to Civil Local Rule 7-1(b).  For the reasons explained below, the motions to dismiss are **GRANTED**, the combined motion to amend and amended motion to dismiss is **DENIED AS MOOT**, and the motion to strike the amended motion to dismiss is also **DENIED AS MOOT**.

I.      **BACKGROUND**

        A.      **Factual background**

        Plaintiff Ankur Chablani was a student and doctoral candidate at California Institute of Integral Studies ("CIIS") and a pre-doctoral intern in counseling and psychological services at California College of the Arts ("CCA").  Dkt. No. 43 ("FAC") ¶¶ 2-3, 9-10.  While a pre-doctoral intern at CCA, Chablani met a female student, Jane Doe.  *Id.* ¶ 11.  Chablani and Doe "came to know each other through mutual friendship with an individual named Janeece Hayes, who was the

Director of the Campus Multicultural Center." *Id.* ¶ 12.  Chablani and Doe "would frequent the Multicultural Center on Monday afternoons." *Id.* ¶ 13.  They "began to converse casually before developing a more structured friendship." *Id.* ¶ 14.  "As the friendship evolved, Jane Doe inquired as to what [Chablani] did on campus," and he "responded that he was a counselor with Counseling and Psychological Services." *Id.* ¶¶ 15-16.  Doe "expressed that she had been considering therapy in her personal life." *Id.* ¶ 17.  Chablani "explained how to request services from Counseling and Psychological Services and if Jane Doe so desired, how to specifically request him as her provider." *Id.* ¶ 18.  "Doe did not immediately register for services." *Id.* ¶ 19.  When she "eventually did attempt to do so, [Chablani] did not have openings for new clients." *Id.*

On February 16, 2024, Doe emailed Chablani, "requesting information on African-American therapists she could interview for a documentary she was working on." *Id.* ¶ 20.  Initially, Chablani and Doe "agreed to meet in the Multicultural Center but would ultimately agree to meet in Counseling and Psychological Services in order to have a quieter environment to facilitate discussion." *Id.* ¶ 21.  During this meeting, "Doe delved deeper into her reasons for seeking counseling." *Id.* ¶ 22.  Chablani "explained that if Jane Doe engaged him in a therapeutic relationship, they would need to discontinue their friendship." *Id.* ¶ 23.  She "considered the options and stated she would prefer to remain friends and would prefer not to commence a therapeutic relationship." *Id.* ¶ 24.  Chablani "advised Jane Doe that as friends he would be willing to allow her to confide in him though it would be informal and as friends." *Id.* ¶ 25.

On March 4, 2024, Chablani sent Doe "a text message . . . inviting her to the Counseling and Psychological Services office." *Id.* ¶ 26.  Upon her arrival, Chablani "was gathering his belongings and asked if Jane Doe would like to go for a drink at Parkside (a popular local bar)." *Id.* ¶ 27.  Doe "accepted the invitation and the two arrived at Parkside at approximately 3:30 in the afternoon." *Id.* ¶ 28.  At the bar, Chablani "ordered and consumed one beer and Jane Doe ordered and consumed one 'lemon drop.' " *Id.* ¶ 29.  Chablani "expressed his attraction to and romantic interest in Jane Doe and inquired if this was reciprocated." *Id.* ¶ 30.  Doe "replied that she was 'open and going with the flow.' " *Id.* ¶ 31.  They "turned the conversation to other topics such as local nightlife." *Id.* ¶ 32.

United States District Court
Northern District of California

Doe "then produced a marijuana cigarette and asked if [Chablani] would like to smoke it with her.  Jane Doe and [Chablani] left together to smoke marijuana in a local park." *Id.* ¶ 33. Doe "teased [Chablani] for being a 'lightweight' in reference to his marijuana intake." *Id.* ¶ 34. She "accepted a ride from [Chablani] as he was traveling to Oakland and she was traveling to Emeryville." *Id.* ¶ 35.  "While crossing the Bay Bridge and engaged in conversation the two opted to get dinner together." *Id.* ¶ 36.  At around 6:30 that evening, they "arrived at a restaurant called 'Comal' where they split a burrito and each had a half glass of wine." *Id.* ¶ 37. Chablani "offered Jane Doe a ride to the Emeryville Mall, but she said that she had changed her mind about going to the mall." *Id.* ¶ 38.  Chablani "jokingly retorted that she had changed her mind because she was having so much fun." *Id.*  Doe "confirmed that she was having a good time." *Id.* ¶ 39.  This prompted Chablani "to inquire if she wanted to come back to his place to either consume more marijuana or another glass of wine[,]" to which Doe responded, " 'hell yeah.' " *Id.* ¶¶ 40-41.  The two arrived at Chablani's apartment around 8:00 p.m. *Id.* ¶ 42.

"Before going upstairs Jane Doe posed for a picture on [Chablani's] motorcycle." *Id.* ¶ 43. They "went inside where they had a glass of wine and prepared to smoke more marijuana[.]" *Id.* ¶ 44.  Chablani "invited Jane Doe to do yoga with him." *Id.* ¶ 45.  He then offered her a massage, and "he massaged her for 15-20 minutes." *Id.* ¶ 46.  After the massage, Chablani "kissed Jane Doe's neck, and Jane Doe turned around and kissed [Chablani] back." *Id.* ¶ 47.  "While engaged in kissing, the two commenced to undress each other before Jane Doe commenced oral sex upon [Chablani] on her own accord." *Id.* ¶ 48.  Chablani "then performed oral sex on Jane Doe." *Id.* ¶ 49.  "After several minutes elapsed, [Chablani] advised Jane Doe he was 'going to go get a condom, ok?'  Jane Doe nodded in agreement indicating her consent." *Id.* ¶ 50.

Chablani "returned but dropped the condom and had to retrieve another." *Id.* ¶ 51.  When he returned, "Jane Doe again performed oral sex on [Chablani] before the two engaged in vaginal intercourse." *Id.* ¶ 52.  During intercourse, Chablani "observed blood on the condom and proceed [*sic*] to inquire if Jane Doe would be more comfortable in the bed." *Id.* ¶ 53.  Doe "got up and followed [Chablani] to the bedroom." *Id.* ¶ 54.  Doe said "she hurt slightly but was mainly sleepy and tired." *Id.* ¶ 55.  She "consented to [Chablani] performing oral sex on her again." *Id.* ¶ 56.

"Afterwards, [Chablani] asked if Jane Doe was ready to go home. Jane Doe said yes." *Id.* ¶ 57. Doe told Chablani "that often after intercourse [she] becomes distant and 'cancels' men." *Id.* ¶ 58. "At no point did Jane Doe give any indication that she did not consent to the sexual activity." *Id.* ¶ 59. Chablani "then drove Jane Doe back to her residence where the two kissed goodnight." *Id.* ¶ 60.

The next morning, Chablani "sent Jane Doe a text message expressing his gratitude for a 'fun and spontaneous evening' and included a link to the artist of a painting Jane Doe admired in his apartment." *Id.* ¶ 61. Doe replied, " 'thank you for yesterday and the link to the artist.' " *Id.* *Id.* ¶ 62. Chablani "also sent a picture of Jane Dow [*sic*] on his motorcycle, to which she said 'lol thanks' with a smiley face emoji." *Id.* ¶ 63. On March 7, 2024, Doe texted Chablani:

> [H]ey, I've had some time to think about our situation, and this isn't something I am interested in. I feel this is inappropriate due to the significant age gap between us and it shouldn't have happened. I do not have the same feelings for you as you do for me. And given the course of things, it's best the friendship be terminated along with all forms of communication.

*Id.* ¶ 64. Chablani "responded with understanding and that he expected as much given the prior comment about 'cancelling' men after intercourse." *Id.* ¶ 65.

Doe then "reported the event to the school and claimed it was non-consensual and sexual assault." *Id.* ¶ 66. On March 9, 2024, Chablani "received an email from Maira Lazdins, Vice President of Human Resources for CCA, stating that he was being accused of sexual misconduct/harassment by Jane Doe and that he was being placed on leave from his internship." *Id.* ¶ 67. Chablani "responded to the email on the same day and arranged to meet with Amanda Al-Shamari, also from CCA HR, on the following Monday, March 11, 2024." *Id.* ¶ 68. On March 11, 2024, Chablani "met with Ms. Lazdins, Ms. Al-Shamari, and Shedrick McClendon, the Dean of Students for CIIS[,]" and Chablani "presented the evidence stated above showing that the sexual encounter was consensual." *Id.* ¶ 69. On March 19, 2024, Ms. Lazdins sent Chablani "a letter sustaining the complaint and terminating [his] position at CCA." *Id.* ¶ 70. On March 26, 2024, Chablani "received a letter from Adrienne Murray, the Interim Title IX Coordinator for CIIS, stating that the CCA investigation had concluded and that CIIS was conducting its own

inquiry." *Id.* ¶ 71. The letter stated "CIIS did not have control over [Chablani] during the time of the alleged misconduct, and that therefore the inquiry would use the policy outlined in the Student Handbook, rather than the Title IX procedure." *Id.* ¶ 72.

Chablani "was denied the opportunity to have a Live Hearing and therefore also to ask questions of Jane Doe including questions that challenge her credibility." *Id.* ¶ 73. On April 5, 2024, Attorney Vincent Tong, on behalf of Chablani, "sent a letter to Adrienne Murray, outlining the procedural and substantive problems with the conduct and outcome of the investigation." *Id.* ¶ 74. CIIS sent its investigative report to Chablani on May 15, 2024. *Id.* ¶ 75. "Ultimately, CIIS decided to expel [Chablani] with [a] notation on his transcript being rendered on June 11, 2024." *Id.* ¶ 76. Chablani appealed, and that appeal was denied on June 27, 2024. *Id.* ¶ 77. Chablani has paid approximately $200,000.00 in tuition to CIIS. *Id.* ¶ 78. As a result of the actions of CCA and CIIS, Chablani "has been prevented from attaining hours towards his graduation, termination [*sic*] from his internship, alienated from his professional community and has suffered damage to his future career prospects." *Id.* ¶ 78.

### B.   Procedural background

On August 5, 2025, Chablani commenced this action against CIIS and CCA and their respective boards of trustees. Dkt. No. 1. Defendants moved to dismiss Chablani's original complaint, Dkt. Nos. 30, 40, 41, and in lieu of opposing those motions, Chablani filed an amended complaint on December 16, 2025. Dkt. No. 43. In the operative amended complaint, Chablani asserts claims for violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. §§ 1681-1688, negligence, breach of contract, defamation, and violation of the California Unruh Civil Rights Act, California Civil Code § 51.[1] *Id.* ¶¶ 80-139. He seeks damages, attorney fees and

---

[1] As used herein, "Defendants" refers to CCA and CIIS, sued "by and through" their respective boards of trustees, in the amended complaint. It does not include the Doe defendants named in the amended complaint because Chablani has made no showing that the inclusion of any Doe defendant is proper at this stage. *See Muhammad v. Mendez*, No. 23-CV-00789-AMO (PR), 2023 WL 6307301, at *2 (N.D. Cal. Sept. 27, 2023) ("Although the use of 'John Doe' to identify a defendant is not favored in the Ninth Circuit . . . , situations may arise where the identity of alleged defendants cannot be known prior to the filing of a complaint. In such circumstances, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover their identities or that the complaint should be dismissed on other grounds.") (internal citations omitted).

costs, and an injunction for removal of the notation from his transcript, reinstatement as a student in good standing and as an intern, and permission to complete his doctoral program. *Id.* at 14, 16, 18, 20, 22. Chablani asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over this state law claims. *Id.* ¶¶ 5-6.

CIIS moved to dismiss the amended complaint on January 15, 2026. Dkt. No. 47 ("CIIS Mot."). Chablani filed his opposition to the motion on January 29, 2026, attaching two documents as exhibits.[2] Dkt. No. 49 ("CIIS Opp."). In lieu of filing of a reply in support of its motion, on February 9, 2026, CIIS filed a combined motion to amend and amended motion to dismiss because it "inadvertently failed to address the Amended Complaint's Unruh Act claim." Dkt. No. 51. Chablani moved to strike the amended motion to dismiss on February 11, 2026. Dkt. No. 52. On February 19, 2026, CIIS filed an opposition to the motion to strike. Dkt. No. 54. Chablani filed an opposition to the amended motion to dismiss on February 23, 2026.[3] Dkt. No. 55. CIIS's reply

---

[2] The first document is titled California Institute of Integral Studies, Title IX Policy and Procedure Governing Students and Employees Fall 2023. Dkt. No. 49-1. The second document appears to be a letter dated March 26, 2024, from CIIS to Chablani. Dkt. No. 49-2. There is no declaration authenticating these documents as required by Civil Local Rule 7-5, no pending request for judicial notice or incorporation by reference, and no authority from Chablani as to why these documents may be properly considered in deciding the CIIS's motion to dismiss. For these reasons, the Court has not considered them.

[3] Chablani's opposition to the amended motion to dismiss does not respond to CIIS's substantive arguments about Title IX, negligence, breach of contract, or defamation. Instead, as to each of those claims, Chablani repeats, nearly verbatim, the following argument:

> Plaintiff relies on the argument previously presented in his Opposition to Defendant's Motion to Dismiss. [ECF 049]. Defendant's attempt to revise or expand its Title IX arguments at this stage should be rejected. Rule 12 does not permit a moving party to reshape its theories after briefing has closed, particularly where the omission was of Defendant's own making. Fed. R. Civ. P. 12. Plaintiff should not be forced to repeatedly defend against shifting Title IX arguments simply because CIIS failed to raise them earlier. The Court should therefore decline to consider any newly asserted Title IX grounds in the amended motion.

Dkt. No. 55 at 6; *see also id.* at 7. This is improper for three reasons. First, as set forth in the Court's Standing Order for Civil Cases, the Court does not permit incorporation by reference. *See* Standing Order for Civil Cases ¶ H.7 ("Parties may not incorporate by reference prior arguments submitted in the case."). Second, Chablani's counsel has not identified any revised or expanded arguments advanced by CIIS in connection with his claims under Title IX, negligence,

6

in support of its amended motion to dismiss followed on February 27, 2026.  Dkt. No. 56.

CCA moved to dismiss the amended complaint on January 23, 2026.  Dkt. No. 48 ("CCA Mot.").  Chablani filed his opposition on February 6, 2026, with one document attached as an exhibit.[4]  Dkt. No. 50 ("CCA Opp.").  CCA filed its reply on February 13, 2026.  Dkt. No. 53 ("CCA Reply").

## II.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  To overcome a Rule 12(b)(6) motion to dismiss, the factual allegations in the plaintiff's complaint " 'must . . . suggest that the claim has at least a plausible chance of success.' "  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (alterations in original)).  In ruling on a Rule 12(b)(6) motion, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

"[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  The court may dismiss a claim "where there is either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal claim."  *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011) (citing *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008)).  "[T]he non-conclusory 'factual

---

breach of contract or defamation.  *See generally* Dkt. No. 55.  Third, a comparison of the CIIS's original motion and its amended motion reveals no revision or expansion as Chablani's counsel claims and instead confirms CIIS's representation that the arguments made in connection with these causes of action are the same in both the original motion and its amended motion.  Dkt. No. 56 at 4, 5.  Chablani's counsel is cautioned against violating any order of this Court or making unfounded representations to this Court.

[4] The document appears to be an online version of CCA's 2025 Sex Discrimination Policy.  Dkt. No. 50-1.  The Court declines to consider this document for the same reasons it declines to consider the exhibits to Chablani's opposition to CIIS's motion to dismiss.

content' and reasonable inferences from that content must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

### III.    DISCUSSION

The Court first takes up the sole federal claim Chablani asserts because, without a viable federal claim, the Court declines to exercise supplemental jurisdiction over Chablani's state law claims.[5] *See Bridges v. Geringer*, No. 5:13-CV-01290-EJD, 2015 WL 2438227, at \*7 (N.D. Cal. May 21, 2015) (citing 28 U.S.C. § 1367(c)(3)).

####      A.    CIIS is entitled to dismissal of the Title IX claim.

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "Victims of sex discrimination have a private right of action against recipients of federal education funding for alleged Title IX violations," and they "may seek damages for those violations[.]" *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020). "[I]f the 'official policy' of the funding recipient discriminates on the basis of sex[,]" damages are available. *Id.* (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). However, "[i]n the absence of an official policy, damages are not recoverable unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* (internal quotations and citation omitted). "[T]here must be an official decision by the recipient not to remedy the violation." *Id.* at 1104-05 (internal quotations and citation omitted).

"To ensure that a funding recipient is liable only for its own misconduct . . . a plaintiff alleging a Title IX claim against a school that arises from student-on-student or faculty-on-student

---

[5] Because the Court limits its analysis to Chablani's Title IX claim, CIIS's motion to amend its motion to dismiss and its amended motion to dismiss, Dkt. No. 51, are **DENIED AS MOOT**. Chablani's motion to strike the amended motion to dismiss, Dkt. No. 52, is also **DENIED AS MOOT**. The Court therefore treats CIIS's original motion to dismiss, Dkt. No. 47, and Chablani's opposition to that motion, Dkt. No. 49, as operative.

United States District Court
Northern District of California

United States District Court
Northern District of California

sexual harassment or assault must establish five elements." *Id.* at 1105 (internal quotations and citation omitted). "First, the school must have 'exercise[d] substantial control over both the harasser and the context in which the known harassment occur[red].' " *Id.* (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (modifications in original)). "Second, the plaintiff must have suffered harassment 'that is so severe, pervasive, and objectively offensive that it can be said to deprive the [plaintiff] of access to the educational opportunities or benefits provided by the school.' " *Id.* (quoting *Davis*, 526 U.S. at 650) (modifications in original)). "Third, a school official with 'authority to address the alleged discrimination and to institute corrective measures on the [school's] behalf' must have had 'actual knowledge' of the harassment." *Id.* (quoting *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (modifications in original)). "Fourth, the school must have acted with 'deliberate indifference' to the harassment, such that the school's 'response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances.' " *Id.* (quoting *Davis*, 526 U.S. at 648). "This is a fairly high standard—a 'negligent, lazy, or careless' response will not suffice." *Id.* (citing *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006)). A "plaintiff must demonstrate that the school's actions amounted to an official decision . . . not to remedy the discrimination." *Id.* (internal quotations and citations omitted). Finally, "the school's deliberate indifference must have 'subject[ed the plaintiff] to harassment.' " *Id.* (quoting *Davis*, 526 U.S. at 644) (modification in original). That is, "the school must have 'cause[d the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it.' " *Id.* (quoting *Davis*, 526 U.S. at 645) (modifications in original).

In connection with his Title IX claim, Chablani alleges that CIIS and CCS were "nonprofit corporation[s] for public benefit receiving federal financial funding." FAC ¶¶ 82, 83. Chablani also alleges that "[t]he internship program at CCA bears the characteristics of an 'education program or activity' because it is affiliated by agreement with CIIS, provides supervision of practice, and delivers essential training for students seeking a graduate degree in psychology." *Id.* ¶ 86.

Chablani asserts these institutions were required to "respond affirmatively to [*sic*] when a

school official with the ability to take corrective measures receives actual knowledge that a student may have been discriminated against on the basis of sex" and "conduct their investigations of [Chablani] in accordance with Title IX." *Id.* ¶¶ 84, 85. He further contends Defendants "failed to provide [Chablani] with the procedural protections required under Title IX, including a live hearing where both sides can ask questions of the witnesses." *Id.* ¶ 87. He also claims CIIS and CCA knew that Chablani "was entitled to these procedural protections but deliberately chose not to provide them." *Id.* ¶ 88. CIIS followed a policy from its student handbook instead of the required Title IX procedure. *Id.* ¶ 93. Defendants did not properly consider evidence of consent and made unsupported credibility determinations in Doe's favor. *Id.* ¶¶ 95- 96. The disciplinary proceedings "were motivated by gender bias and resulted in an erroneous outcome." *Id.* ¶ 97.

CIIS moves to dismiss Chablani's Title IX because he has failed to sufficiently allege control and an official policy. CIIS Mot. at 3-5. The Court considers each argument in turn.

CIIS's control argument is two-fold. It argues Chablani's amended complaint contains no allegations that CIIS exercised the requisite control while Chablani was an intern at CCA and when the alleged assault occurred at Chablani's off-campus apartment. *Id.* at 5. In opposition, Chablani argues, without citation to any legal authority, that CIIS "did have adequate control over the educational context in which [he] met Jane Doe" because his internship at CCA was a required component of his doctoral program at CIIS, and because CIIS approved the placement, coordinated with CCA, supervised his progress, and was involved in the disciplinary proceedings. CIIS Opp. at 8-9. Assuming, without deciding, that this could demonstrate control over Chablani in "the educational context in which [he] met Jane Doe[,]" *id.* at 8, it does not demonstrate control in the off-campus context of Chablani's apartment, where the alleged sexual assault that gave rise to the disciplinary proceedings occurred. *See Brown v. Arizona*, 82 F.4th 863, 878 (9th Cir. 2023) ("an element of 'school sanction, sponsorship, or connection to a school function is required for a school to control an off-campus context").

Chablani's bare-bones argument that "whether CIIS had the level of control required is a fact-intensive inquiry inappropriate for dismissal," CIIS Opp. at 9, does not save his insufficiently pleaded claim. In the case on which Chablani relies for that proposition, *Brown v. Arizona*, 82

United States District Court
Northern District of California

F.4th 863, 878 (9th Cir. 2023), the Ninth Circuit found that based on the university's rules and its disciplinary power over students living in off-campus housing, a reasonable jury could conclude that the school had substantial control over the context in which an alleged sexual assault occurred. *Id.* at 879 (internal quotations omitted). Unlike in *Brown*, Chablani points to no allegations plausibly suggesting CIIS's control over his off-campus apartment. His Title IX claim is therefore subject to dismissal for lack of adequate allegations of control.

Dismissal of the Title IX claim is also warranted due to the lack of allegations of an official policy. On this point, CIIS argues that the amended complaint contains no allegation that it discriminated against Chablani on the basis of sex pursuant to an official policy. *Id.* at 6. In opposition, Chablani argues that he "has adequately pled facts showing that gender bias was present." CIIS Opp. at 9. Chablani alleges "CIIS made unsupported credibility determinations favoring the female complainant without allowing [him] to challenge those determinations." *Id.* He contends that "CIIS's disciplinary proceedings were motivated by gender bias and resulted in an erroneous outcome." *Id.* It "failed to adequately consider [*sic*], including Jane Doe's enthusiastic response of 'hell yeah' when invited to [Chablani's] apartment, her active participation in sexual activity, her nodding agreement when asked about using a condom, and friendly text messages exchanged the following day." *Id.* at 10. CIIS also "made unsupported credibility determinations favoring the female complainant without allowing [Chablani] to challenge those determinations through cross-examination and failed to consider Jane Doe's own statement that she often becomes distant and 'cancels' men after intercourse." *Id.* According to Chablani, "[t]here is a clear question of fact as to whether Defendant CIIS breached its duty under Title IX." *Id.*

None of these arguments address CIIS's point that Chablani has failed to allege facts plausibly establishing the existence of the requisite policy. *See generally* CIIS Opp. The two cases on which Chablani relies also fail. In *Austin v. University of Oregon*, a female student accused three student athletes of sexual assault. 925 F.3d 1133, 1135 (9th Cir. 2019). After a disciplinary hearing, the athletes were found responsible for sexual misconduct. *Id.* at 1136. They were suspended and their scholarships were not renewed. *Id.* The athletes brought a Title IX

United States District Court
Northern District of California

claim based on sex discrimination and due process violations. *Id.* The district court dismissed a third amended complaint with prejudice. *Id.* On appeal, the Ninth Circuit affirmed, *id.* at 1137, rejecting all three of the athletes' theories under Title IX – selective enforcement, erroneous outcome, and deliberate indifference. *Id.* at 1138. The Ninth Circuit explained: "The essence of the selective enforcement theory is that the decision to discipline the student athletes was 'grounded' in gender bias. But the student athletes fail[ed] to allege how this [wa]s so." *Id.* at 1138. Their "erroneous outcome theory also fail[ed] because the student athletes d[id] not articulate any basis to discern that the administration or outcomes of the disciplinary proceedings were flawed due to the student athletes' sex. Even if the outcome of the administrative conference procedure was erroneous, the complaint [wa]s missing any factual allegations that show that sex discrimination was the source of any error." *Id.* (internal citation omitted). Finally, the athletes' deliberate indifference theory failed because they "only ma[d]e passing reference to it in one line of a footnote[,]" and so the argument, lacking meaningful briefing, was deemed waived. *Id.* at 1138-39. Chablani's amended complaint suffers from the same infirmities, as he has alleged no factual support for his claims.

Chablani argues that his "allegations mirror those found sufficient in *Austin*."[6] CIIS Opp. at 9. The allegations do mirror each other, but contrary to Chablani's representation, the allegations in *Austin* were not sufficient.[7] Accordingly, given the admitted resemblance between Chablani's allegations and those at issue in *Austin*, where dismissal was appropriate for insufficient pleading, dismissal is appropriate here on Chablani's Title IX claim. *Cf. Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 951 (9th Cir. 2020) (concluding sex discrimination was a plausible explanation for university's disciplinary action against plaintiff in light of allegations "of

---

[6] Chablani also argues that his allegations mirror those in *Doe v. Purdue University*, 928 F.3d 652, 668-69 (7th Cir. 2019). Not so. In that case, the plaintiff had pleaded sufficient facts to state a claim under Title IX where he alleged, among other things, that the "school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct" and that "the university tilted the process against men accused of sexual assault so that it could elevate the number of punishments imposed[,]" which "would permit Purdue to signal its commitment to cracking down on campus sexual assault." *Id.* at 668. Chablani alleges no such facts here.

[7] Chablani's counsel is cautioned that continuing to mispresent case law will result in sanctions.

12

background indicia of sex discrimination along with the allegations concerning [plaintiff's] particular disciplinary case" such that plaintiff's Title IX claim could survive a motion to dismiss).

Accordingly, CIIS's motion to dismiss Chablani's Title IX claim is **GRANTED**.

### B.    CCA is entitled to dismissal of the Title IX claim.

CCA separately moves to dismiss Chablani's Title IX claim on three grounds.  First, CCA argues that Chablani's allegations fail to "satisfy the essential jurisdictional prerequisites for Title IX coverage[,]" namely, substantial control.  CCA Mot. at 12-16.  Second, CCA argues that Supreme Court precedent precludes private civil claims for damages based on violations of Title IX procedural requirements.  *Id.* at 16-18.  Third, CCA argues that Chablani fails to allege a substantive Title IX sex discrimination claim.  *Id.* at 18-19.

The Court has already concluded that Chablani has failed to sufficiently allege control or a viable sex discrimination claim as discussed above in connection with CIIS's motion to dismiss. The Court therefore focuses on CCA's argument that Chablani's Title IX claim is barred under Supreme Court precedent.  CCA contends that "[e]ven if the Amended Complaint alleged facts to support a claim that CCA violated Title IX procedural requirements," Chablani cannot maintain a claim for damages under *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998).  CCA Mot. at 16-18.

Chablani does not respond to CCA's argument or address *Gebser*.  *See generally* CCA Opp.  Instead, Chablani argues:

> CCA acknowledges it's [*sic*] Title IX responsibilities through its policies and procedures. **[Exhibit** A].
> CCA's motion rests on the premise that it had no Title IX jurisdiction and therefore no obligation to provide Plaintiff with Title IX-compliant procedures. But CCA's own Sex Discrimination Policy—publicly posted and binding on the institution—directly contradicts that assertion. The policy makes clear that CCA's obligations extend far beyond on-campus incidents and apply to any individual participating in or attempting to participate in CCA's programs or activities, including interns placed at CCA through educational partnerships. **[Exhibit A].**
> CCA does not dispute—that he was a pre-doctoral intern in CCA's Counseling and Psychological Services ("CAPS"), performing clinical work for CCA students under CCA supervision. Under CCA's own policy, Plaintiff was unquestionably "participating in CCA's program or activities," and therefore entitled to the protections of the policy and Title IX. **[Exhibit A].**

United States District Court
Northern District of California

CCA's policy further states that it applies to misconduct occurring "on CCA property or anywhere else that has a connection to sponsored events or programs involving the College," and even to off-campus conduct that "interferes with students having a safe or welcoming experience" or "substantially interferes with the College's educational interests or mission." **[Exhibit A]**. This language is far broader than the narrow jurisdictional interpretation CCA now urges. Plaintiff's internship was a CCA-sponsored educational program; the complainant was a CCA student; and the allegations directly implicated CCA's clinical training environment. Under CCA's own policy, the matter fell squarely within its jurisdiction.

Even if CCA believed the conduct did not meet the federal definition of Title IX sexual harassment, its policy requires a Step 1 Initial Evaluation and Step 2 Jurisdiction Assessment before dismissing a matter from Title IX procedures.  **[Exhibit A].**

The policy mandates that the Title IX Coordinator must:
• assess whether the conduct "may reasonably constitute a violation of the Policy";
• determine whether CCA has jurisdiction;
• offer supportive measures to both parties;
• notify the respondent of the process; and
• provide equal opportunity to participate in the evaluation.
**[Exhibit A].**

Plaintiff alleges that none of these required steps occurred. Instead, CCA immediately placed him on leave and proceeded as though the allegations were substantiated, without providing him with the neutral, evidence-based evaluation the policy requires. CCA's policy also mandates a presumption of non-responsibility, stating that the College presumes the Respondent is not responsible for the reported misconduct unless and until the evidence supports a different determination. CCA did the opposite: it presumed his guilt as a male respondent, disregarded extensive evidence of consent— including Jane Doe's "hell yeah" response to visiting his apartment, her active participation in sexual activity, and her friendly text messages the next day—and credited the complainant without scrutiny. This is a direct violation of CCA's own neutrality and presumption-of-innocence requirements.

Moreover, CCA's policy requires that credibility determinations be grounded in evidence, not stereotypes or assumptions. CCA made unsupported credibility findings, ignored exculpatory evidence, and defaulted to believing the complainant because she was female and he was male. This is precisely the type of gender-based presumption the policy—and Title IX—prohibits.

CCA's policy is unequivocal: it applies to interns; it applies to off-campus conduct connected to CCA programs; it requires neutrality, evidence-based evaluation, and a presumption of non-responsibility; and it mandates fair procedures. CCA violated each of these requirements.

CCA Opp. at 12-13 (emphasis in original).[8]

---

[8] Chablani also argues that "[w]hether CCA had the level of control required is a fact-intensive inquiry inappropriate for dismissal," that "CCA's refusal to apply Title IX procedures—while

United States District Court
Northern District of California

As a preliminary matter, Exhibit A is not properly before the Court. It is not properly authenticated, and it is not the subject of any pending request for judicial notice or incorporation by reference. *See generally* CCA Opp. The Court therefore rejects Chablani's arguments based on the exhibit and does not reach CCA's related arguments in reply.

Setting Exhibit A aside, to the extent Chablani seeks damages for any alleged failure by CCA to adhere to certain procedures, it is foreclosed by *Gebser*. In that case, the Court held that absent actual notice and deliberate indifference, a school district cannot be held liable for damages under Title IX for a teacher's sexual harassment of a student. 524 U.S. at 292-93. It also rejected the petitioners' argument that the district's failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims violated Title IX's implementing regulations. *Id.* at 291. The Court explained:

> [The district's] alleged failure to comply with the regulations . . . does not establish the requisite actual notice and deliberate indifference. And in any event, the failure to promulgate a grievance procedure does not itself constitute "discrimination" under Title IX. Of course, the Department of Education could enforce the requirement administratively: Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U.S.C. § 1682, even if those requirements do not purport to represent a definition of discrimination under the statute. . . . We have never held, however, that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements.

*Id.* at 291-92.

Applied here, *Gebser* compels dismissal of Chablani's Title IX claim to the extent it seeks damages for an alleged violation of Title IX's implementing regulations. Accordingly, CCA's motion to dismiss the claim on this ground is **GRANTED WITHOUT LEAVE TO AMEND**.

///

///

---

simultaneously imposing Title IX-level sanctions—also supports a selective enforcement theory[,]" and that "[t]here is a clear question of fact as to whether Defendant CCA breached its duty under Title IX." CCA Opp. at 13. None of these arguments excuse the threshold pleading deficiencies that warrant dismissal.

## IV.   CONCLUSION

For the reasons set forth above, the pending motions to dismiss are **GRANTED** as to Chablani's Title IX claim.  A second amended complaint is due within 21 days of this Order and must be filed with the redline required by Paragraph H.1 of the Court's Standing Order for Civil Cases.  Chablani may not plead new claims or name additional parties absent leave of Court or Defendants' consent.  In the absence of a viable Title IX claim, the Court declines supplemental jurisdiction over Chablani's state law claims, which stand **DISMISSED**. *See Bridges*, 2015 WL 2438227, at *7 ("With the dismissal of the only federal claim asserted in the Complaint, the court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. They will also stand dismissed.").  Should Defendants move to dismiss Chablani's forthcoming second amended complaint, the briefing on those motions shall address the factors that govern whether further leave to amend should be granted and whether the Court should decline supplemental jurisdiction over any remaining state law claims.

The case management conference currently set for May 7, 2026 and the April 30, 2026 deadline for the parties' joint case management statement are **VACATED** and will be re-set at a later date if appropriate.

**IT IS SO ORDERED.**

Dated: April 27, 2026

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

16